O

# United States District Court
# Central District of California

| | |
|---|---|
| FCM CAPITAL PARTNERS LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>REGENT CORPORATE CONSULTING LIMITED; REGENT TRUST; JOHN R. MILLER; JOHN GRICE; and DOES, inclusive,<br><br>　　　　　　　Defendants. | Case No. 2:14-cv-07099-ODW (MANx)<br><br>**ORDER GRANTING PLAINTIFF FCM CAPITAL PARTNERS LLC'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT REGENT CORPORATE CONSULTING LIMITED [36]** |

## I. INTRODUCTION

John R. Miller and John Grice convinced Chris Miller, President of FCM Capital Partners LLC ("FCM"), to invest $500,000 on behalf of FCM in Regent Corporate Consulting Limited ("RCC")—a carbon credit business—with a "guaranteed" return of $5,395,000 within three months. (Compl. ¶ 53.) Near the end of the three month period, the Defendants asked to extend the end date an additional five months. (*Id.* ¶ 61.) When the new deadline arrived, Defendants were

nonresponsive and FCM received no money. (*Id.* ¶ 68.) FCM filed suit against Miller, Grice, RCC, and Regent Trust for fraud in the inducement, conspiracy to commit fraud, and multiple violations of the Racketeer Influenced and Corrupt Organizations Act. (ECF No. 1.) When RCC failed to respond to the Complaint, default was entered and FCM moved for default judgment. (ECF No. 36.) For the reasons discussed below, the Court **GRANTS** FCM's Motion.

## II. FACTUAL ALLEGATIONS

*1. Background*

FCM is a California financial services company that connects investors to high-growth investment opportunities. (Compl. ¶ 19.) FCM was founded in 2009 by Chris Miller ("Chris"), the company's current President.[1] (*Id.*) FCM specializes in film financing and assisted-living projects. (*Id.*)

In early 2012, FCM was looking for investors for a biofuel project and was referred to Defendants John R. Miller ("Miller") and John Grice ("Grice"). (*Id.* ¶ 20.) It is unclear who referred Miller and Grice. FCM's officers researched Grice's background and were impressed by his professional experience. (*Id.* ¶ 21.) Grice's experience included serving as a Partner and Managing Director of PricewaterhouseCoopers in Singapore, and nearly two decades with Her Majesty's Customs & Excise in the United Kingdom. (*Id.*) FCM's officers received this information through an email sent by Chris from what appears to be an online work profile. (Compl., Ex. 1.)

Miller and Grice presented FCM with an opportunity to invest in RCC, a carbon credit business. Carbon credits are permits that allow the holder to emit one ton of carbon dioxide and can be traded in the international market. (*Id.*) Grice served as Managing Director of RCC, while Miller was directly involved in RCC as Grice's business partner. (ECF No. 36.) FCM believed Miller and Grice's representation that

---

[1] FCM President, Chris Miller, shares the same last name as Defendant John Miller. To avoid confusion, the Court will refer to the FCM President by his first name, Chris.

returns from RCC were highly lucrative, and entered an agreement to invest. (*Id.*)

### 2. *Formation of the Fraud*

In January 2012, Chris,[2] on behalf of FCM, met with Miller and Grice in Las Vegas, Nevada to pitch the biofuel project as an investment opportunity. (Compl. ¶ 22.) Both Miller and Grice portrayed themselves as wealthy and powerful business partners who had access to, and control of, billions of dollars of potential investment capital. (*Id.*) Grice verified his and Miller's "wealth" by logging into the banking website for Standard Chartered Bank in front of Chris and showing that they had access to a bank account with a balance of over five hundred million dollars. (*Id.* ¶ 23.)

FCM presented the biofuel project to Miller and Grice, but they were not interested. (*Id.* ¶ 25.) FCM then presented the investment opportunities that FCM specializes in: the "Summer Place Living" and film financing projects. (*Id.*) Miller and Grice were not interested in either project at that time. (*Id.*)

After the meeting in Las Vegas, FCM did not speak to Miller or Grice until Miller called FCM in April. (*Id.* ¶ 26.) Miller indicated over the phone that he really enjoyed meeting Chris, and that he and Grice were interested in working with FCM on a film financing project. (*Id.* ¶ 27.) Miller then stated that he wanted to meet in person with FCM to further discuss projects. (*Id.*)

In April 2013, Miller emailed FCM a Proof of Funds to assure FCM that he and Grice were capable of funding the film transactions. (*Id.* ¶ 28.) The Proof of Funds was dated April 22, 2013 and indicated that Miller and Grice had access to a bank account with a balance of one billion dollars. (*Id.*) The Proof of Funds was issued on HSBC Letterhead and signed by two HSBC managers: Victor C. Chen and Steve Chow. (*Id.*) FCM believed the Proof of Funds document was legitimate. (*Id.* ¶ 30.)

---

[2] It is unclear from Plaintiff's usage of "FCM" throughout the Complaint whether Plaintiff refers to Chris as an individual or FCM as the company during conversations and business dealings. It is also unclear in some instances whether "FCM" refers to dealings with Chris or other officers of FCM.

However, FCM later discovered that Victor C. Chen stopped working for HSBC in 2011. (*Id.* ¶ 29.)

In April 2013, Miller and Grice scheduled several in-person meetings with FCM for the summer of 2013 to discuss the film financing project as well as assisted-living housing projects. (*Id.* ¶ 31.)

### 3. First Meeting

In June 2013, Miller attended the first summer meeting with FCM in Los Angeles, California. (*Id.* ¶ 39.) During this meeting, Miller and Grice brought up their involvement with RCC. (*Id.*) Miller explained that RCC bought and sold carbon credits, and arranged purchases of carbon credits by third parties. (*Id.*)

Miller represented that the returns on investment in the carbon credits were astronomical. (*Id.* ¶ 41.) FCM believed Miller and Grice based on seeing financial records showing access and control of billions of dollars. (*Id.*) Miller then showed FCM documents relating to a $16 billion transfer from UBS to a Standard Chartered Bank account controlled by Miller and Grice. (*Id.* ¶ 42.)

### 4. Standby Letter of Credit

Miller continued to actively engage in business dealings with FCM involving various projects during the summer of 2013.[3] On June 7, 2013, FCM entered into an agreement with Miller and Grice concerning FCM's film-financing projects. (*Id.* ¶ 33.) FCM agreed to contribute $100,000 to be paid in two installments toward the cost of Defendants' due diligence for film financing and housing projects. (*Id.* ¶ 34.) It is unclear from the Complaint what activities Plaintiff classifies as "due diligence." In exchange, Miller and Grice agreed to send FCM a Standby Letter of Credit for $1 million to ensure that they were financially capable of funding the projects. (*Id.*)

On June 10, 2013, FCM paid its first installment of $50,000 through wire transfer to a bank account belonging to "Better Run Holding Ltd." with Standard

---

[3] Plaintiff FCM's Motion for Entry of Default Judgment Against Defendant John Miller, Nov. 20, 2014, ECF No. 22.

Chartered Bank in Singapore. (*Id.* ¶ 37.) FCM then requested the Standby Letter of Credit before transferring the second installment. (*Id.* ¶ 38.) Over one month later on July 16, 2013, FCM received the Standby Letter of Credit, but the letter was refused by FCM's bank. (*Id.* ¶¶ 45–46.) FCM notified Defendants that the Standby Letter of Credit was rejected. (*Id.* ¶ 47.)

On July 18, 2013, Miller emailed FCM and explained that the rejection was due to document formatting issues. (*Id.*) Miller and Grice then persuaded FCM to transfer the remaining $50,000 even though FCM's bank rejected the Standby Letter of Credit. (*Id.* ¶ 48.)

In August 2013, Miller and Grice again presented FCM with an opportunity to invest in RCC. (*Id.* ¶ 49.) Miller and Grice represented that if FCM invested $500,000, FCM would see a guaranteed return of $5,395,000 within three months. (*Id.*) This calculation was based on the representation that 100 credits sold for $1, and that RCC already had agreements lined up to sell 539,500,000 credits. (*Id.*) Miller and Grice then told FCM that if RCC was unable to fulfill any of the 539,500,000 sales, RCC would pay FCM for any loss suffered by December 31, 2013. (*Id.* ¶ 50.) Defendants then represented that if FCM agreed to invest in RCC's carbon credit business, Defendants would transfer the $100,000 from the June 7, 2013 contract—already earmarked for Defendants' due diligence—to be put towards FCM's total investment of $500,000. (*Id.*) On August 30, 2013, FCM entered an agreement with RCC to invest in carbon credits. (*Id.* ¶ 53.) Under the terms of the agreement, the carbon credit sales were to conclude by December 31, 2013. (*Id.* ¶ 54.) FCM made a wire transfer of $400,000 to an account held by RCC. (*Id.* ¶ 55.)

   5.  *Second and Third Meetings*

Miller continued to meet with FCM in August and September of 2013. (*Id.* ¶¶ 56–57.) In late August, Miller went to FCM's office in Roseville, California for a week to attend the second summer meeting with FCM, and to conduct due diligence on FCM's "Summer Place Living" assisted-living projects. (*Id.* ¶ 56.)

On September 4, 2013, and September 5, 2013, Miller and Grice attended the third summer meeting with FCM in Los Angeles, California. (*Id.* ¶ 57.) At this meeting, Miller and Grice again showed FCM documents that indicated they had access to billions of dollars sitting in one account. (*Id.*)

After the September 2013 meeting in Los Angeles, Miller traveled with FCM to Orange County, California, as Miller wanted to meet with a financial partner of FCM. (*Id.* ¶ 58.) After the Orange County meeting, Miller and Chris went together to the John Wayne Airport in Santa Ana, California where Miller used a two-hour flight delay to further sell FCM on investing in the carbon credit business. (*Id.* ¶ 59.) Miller also sent an email to Chris on September 13, 2013, in which Miller further explained the carbon credit business, and provided documentation regarding enforceable sales agreements that Grice, Miller, and RCC already had in place. (*Id.* ¶ 60.) This documentation indicated that RCC had contracts with numerous large, reputable entities with a total value of $1,137,000,000. (*Id.*)

### 6.  *Defendants Delay Payment and Become Unresponsive*

On November 28, 2013, Grice sent FCM a Notice to Amend the Agreement because the payment of 800 million sold credits had been delayed. (*Id.* ¶ 61.) It is unclear why Grice referred to 800 million credits when FCM invested in 539,500,000. Grice said the Agreement would be modified to say that all sales were expected to conclude by April 30, 2014. (*Id.*) FCM executed the Amendment on December 30, 2013. (*Id.* ¶ 62.) The Amendment actually indicated that it would be in force until May 31, 2014. (*Id.*)

After the Amendment was executed, Miller and Grice became unresponsive to FCM's requests for updates regarding the carbon credit business. (*Id.* ¶ 63.) On February 3, 2014, Chris sent a text message to Miller, in which he indicated that Grice had stopped responding to emails, and inquired whether FCM's money had been stolen. (*Id.* ¶ 64.) Chris also told Miller that he had learned that Grice and Miller may be on the radar with law enforcement agencies. (*Id.*) Miller responded that he was no

longer involved with the carbon credit transactions, and assured Chris that no money had been stolen. (*Id.* ¶ 65.) Chris reminded Miller that he had made great efforts in selling the carbon credit business to FCM at the Orange County Airport, and further questioned why Grice would not respond to FCM if no money had been stolen. (*Id.*) Miller never responded.

On May 31, 2014 when the Amendment expired, FCM did not receive any money from Defendants related to the carbon credit sales, nor did FCM receive any money to compensate FCM for losses against the agreed return of $5,395,000. (*Id.* ¶ 68.) On September 11, 2014 FCM filed suit against Miller, Grice, RCC, and Regent Trust.

### 7. *Judgment Sought*

FCM alleges four claims against RCC: (i) fraud in the inducement; (ii) conspiracy to commit fraud; (iii) violations of Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act; and (iv) conspiracy to violate the Racketeer and Corrupt Organizations Act. (*Id.* ¶¶ 72–96.)

FCM seeks equitable damages in the amount of $500,000, statutory treble damages in the amount of $1,500,000, attorney fees in the amount of $33,600 pursuant to the Local Rule 55-3 fee schedule, costs of suit in the amount of $882, and a post-judgment interest in accordance with 28 U.S.C. § 1961.

This Court already awarded damages to FCM in its Default Judgment Order against Defendant John Miller. (ECF No. 26.) As a general rule, a plaintiff may pursue separate judgments against defendants that are jointly and severally liable for the full amount of plaintiff's damages; but under the "one satisfaction" rule, a plaintiff may recover only one satisfaction for any losses. 47 Am. Jur. 2d Judgments § 809. Specifically, if two or more tortfeasors produce a single injury, the plaintiff may sue each one for the full amount of the damage and hold the defendants severally liable. However, plaintiff can obtain only a single recovery, and each defendant will be entitled to a credit for any sum that the plaintiff has already collected from the other

defendant. (*Id.*) Therefore, this Court is precluded from awarding FCM a duplicate award against RCC for the same cause of action already awarded against Defendant John Miller.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 55(b) authorizes a district court to grant default judgment after the Clerk enters default under Rule 55(a). Local Rule 55-1 requires that the movant submit a declaration establishing (1) when and against which party default was entered; (2) identification of the pleading to which default was entered; (3) whether the defaulting party is a minor, incompetent person, or active service member; and (4) that the defaulting party was properly served with notice.

A district court has discretion whether to enter default judgment. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Upon default, the defendant's liability generally is conclusively established, and the well-pleaded factual allegations in the complaint are accepted as true. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–19 (9th Cir. 1987) (per curiam) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)).

In exercising its discretion, a court must consider several factors, including (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether the defendant's default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

/ / /
/ / /
/ / /
/ / /
/ / /

# IV. DISCUSSION

## A. Notice

On January 28, 2015, RCC was served with the Summons and Complaint through substituted service by FCM. (ECF No. 29.) Therefore, the Court finds that FCM properly served RCC in compliance with Federal Rule of Civil Procedure 4(e)(2)(B).

## B. *Eitel* Factors

The Court finds that the *Eitel* factors weigh in favor of default judgment.

### 1. *FCM Would Suffer Prejudice*

If the Court does not grant default judgment, the case will face a dead end. RCC has had ample opportunity to participate in the adjudicatory process and help the Court resolve this matter.

### 2. *FCM Has Brought Meritorious Claims*

<u>Fraud in the Inducement</u>

FCM's allegations establish that RCC committed Fraud in the Inducement and violated Sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Fraud in the Inducement "occurs when the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable." *Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 294–95 (2005) (internal citations omitted); *see also* Cal. Civ. Code § 1572 (West 2015) ("Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent . . . to induce him to enter into the contract[.]").

FCM's allegations establish in detail that on many occasions between January 2012 and August 2013, Grice (RCC's Managing Director) and Miller (Grice's business partner who was directly involved with RCC), made representations to FCM of being wealthy investors with access to and control of billions of dollars. (ECF No.

36.) Because RCC is not a successful or profitable carbon credit business, the Proof of Funds, Guarantee Standby Letter Credit, and various statements made by phone, email, text message, and in person were also false. Because RCC was represented as legitimate and highly profitable business, FCM assented to the Agreement to invest in RCC. Therefore, RCC committed fraud in the inducement.

### Wire Fraud

The RICO Act makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," or conspire to do so. 18 U.S.C. § 1962(c) & (d). The elements of a civil RICO claim are "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'"" *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (citing *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).

An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A single "individual," single "partnership," single "corporation," single "association," or a single "other legal entity" are all enterprises. *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007). Similarly, "an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise." *Id.* at 551.

Plaintiff's allegations make clear that Miller and Grice—through representing themselves and through the guise of RCC and Regent Trust—qualify as an associated-in-fact enterprise by their relationship with one another.

"Racketeering activity" is any act which is indictable under one of several provisions of Title 18, United States Code, including wire fraud (18 U.S.C. § 1343). 18 U.S.C. § 1961(1)(B). The violation of wire fraud has three elements: "(1) the

formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Odom*, 486 F.3d at 554. Likewise, internet use is considered a use of wires for the purposes of this statute. *See United States v. Selby*, 557 F.3d 968, 979 (9th Cir. 2009) (explaining that an internet email is sufficient to establish a use of wires in furtherance of a scheme). For the racketeering activity to be considered a pattern, there must be at least two predicate acts that are related and together amount to or pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

FCM's allegations establish that Miller and Grice used RCC for the sole purpose of defrauding FCM. Miller and Grice perpetuated that scheme by exchanging numerous emails, phone calls, text messages, wire transfers and fraudulent bank documents with Chris and FCM in an effort to present RCC as a successful and profitable carbon credit business. Through these multiple exchanges over a period of twenty months, RCC has committed more than two predicate acts that all relate and amount to RCC's fraudulent venture. FCM presents ample evidence to establish that RCC committed wire fraud through multiple predicate acts. Therefore, RCC has engaged in a pattern of racketeering activity.

Finally, FCM's allegations establish that FCM sustained a total pecuniary injury of $500,000 to its business and property from its dealings with RCC. Therefore, RCC violated 18 U.S.C. § 1962(c) by committing wire fraud.

Conspiracy to Commit Wire Fraud

"It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). "It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy. The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor*

*Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 774–75 (9th Cir. 2002) (internal citations omitted). In addition, all co-conspirators are liable for each other's acts in a RICO conspiracy. *Id.* at 775.

FCM's allegations demonstrate that corporate defendants RCC and Regent Trust acted along with Miller and Grice to defraud FCM. Therefore, RCC violated Section 1962(d) of the RICO Act.

FCM has pleaded actionable RICO Acts claims and one California state fraud claim against RCC.

       3.    *The Amount at Stake Weighs in Favor of Default Judgment*

FCM seeks equitable damages in the amount of $500,000, which is the amount FCM was fraudulently induced to invest in RCC. Pursuant to 18 U.S.C. § 1964(c), FCM is entitled to statutory treble damages in the amount of $1,500,000, attorney fees, and costs of suit. Therefore, the amount at stake weighs in favor of default judgment.

       4.    *There is No Possibility of Dispute as to Material Facts*

Since RCC has defaulted, it automatically conceded to the allegations pleaded by FCM as true. *Televideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). Thus, there is no possibility of dispute as to material facts.

       5.    *There is Little Possibility Default was Due to Excusable Neglect*

FCM served RCC at its place of business with the Summons and Complaint through substituted service and mailed it to RCC. (ECF No. 29.) RCC has not filed an opposition. This leaves little possibility that default was due to excusable neglect.

       6.    *Policy for Deciding on the Merits Weighs in Favor of Granting Default Judgment*

As stated above, FCM has established that RCC is not a legitimate business. RCC's refusal to participate in the suit further demonstrates to the Court that RCC was used for the sole purpose of defrauding FCM. Therefore, the Court finds that this factor does not preclude entry of default judgment.

**C.     Damages**

   *1.     Statutory Treble Damages*

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"  18 U.S.C. § 1964(c).  FCM sustained a loss of $500,000.  Accordingly, the Court awarded FCM statutory treble damages in the amount of $1,500,000 against Defendant John Miller on February 5, 2015.  (ECF No. 28.)

This Court is precluded from awarding a duplicate award based on the same cause of action against Defendant RCC.  "Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." *Norcen Energy Resources v. Pacific Gas & Elec. Co.*, 1995 U.S. Dist. LEXIS 21943, *24 (N.D. Cal. Dec. 4, 1995).  Accordingly, **FCM is not entitled to damages against RCC**.

   *2.     Equitable Damages*

 FCM seeks an additional $500,000 in equitable damages under California state law.  Cal. Civ. Code § 3333 (West 2014).  In this case, the claims of Fraud in the Inducement and Wire Fraud arise from the same predicate acts and loss suffered.  FCM failed to cite to any authority allowing treble damages to be added to equitable damages.  Therefore, the Court **does not award FCM equitable damages in addition to treble damages**.

   *3.     Post-Judgment Interest*

Because FCM does not request a specific amount in post-judgment interest, the Court **GRANTS FCM post-judgment interest at the rate outlined by 28 U.S.C. § 1961(a)**.[4]

---

[4] The calculation according to 28 U.S.C. § 1961(a) is "[F]rom the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the

*4.     Attorney Fees*

FCM requests the same amount for attorney fees against RCC as it requested from Miller.  (ECF No. 36.)  The Court already granted FCM attorney fees in the amount of $33,600 pursuant to the Local Rule 55-3 fee schedule of the Central District of California.  (ECF No. 28.)  Therefore, the Court is precluded from awarding a duplicative award for attorney fees against Defendant RCC.  *Norcen*, 1995 LEXIS 21943, at *24.

*5.     Costs of Suit*

FCM requests a different amount for costs against RCC than it did against Miller.  (ECF No. 36.)  The Court **GRANTS FCM costs of suit** in the amount of $882 as calculated by adding $400 from filing the Complaint, $450 for service of the Summons and Complaint on RCC in Hong Kong, China, and $32 for costs related to preparing, copying, and delivering mandatory chambers copies to the Court.  (ECF No. 37.)

## V.     CONCLUSION

For the reasons discussed above, the Court **GRANTS** FCM Capital Partner's Motion for Default Judgment.  (ECF No. 36.)

**IT IS SO ORDERED.**

June 24, 2015

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**

---

Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."